[No. B035505. Second Dist., Div. Five. June 29, 1990.]

JOHN K. VAN DE KAMP, as Attorney General, etc., Cross-complainant and Appellant, v.
ROBERT GUMBINER et al., Cross-defendants and Respondents.

COUNSEL

John K. Van de Kamp, Attorney General, Andrea Sheridan Ordin, Chief Assistant Attorney General, Carole Ritts Kornblum, Assistant Attorney General, James R. Schwartz, Yeoryios C. Apallas and H. Chester Horn, Jr., Deputy Attorneys General, for Cross-complainant and Appellant.

Skadden, Arps, Slate, Meagher & Flom, Frank Rothman, James E. Lyons, Jeffrey T. Makoff, O'Melveny & Myers, Donald M. Wessling, Brian S. Currey and Scott L. Landsbaum for Cross-defendants and Respondents.

Keller & Stallard and Jan S. Raymond as Amici Curiae for Cross-defendants and Respondents.

## Opinion

## TURNER, J.*—

### I. Introduction

The Attorney General of the State of California, John K. Van de Kamp, appeals from a judgment of dismissal entered by Superior Court Judge Edward M. Ross following the sustaining of demurrers to the Attorney General's third amended cross-complaint without leave to amend. The Attorney General's action, brought in his own name, was for breaches of a settlement agreement and conspiracy to breach fiduciary duties against FHP, Inc., a health maintenance organization,[1] and for negligent undervaluing of assets and conspiracy to undervalue assets against Ernst & Whinney, an accounting firm. The superior court held that the Attorney General had no authority to maintain the action. Because the Attorney General's authority to supervise and regulate FHP, Inc., under the settlement agreement and the common law was superseded by legislative action, the judgment of dismissal is affirmed. The Attorney General also appeals from Superior Court Judge John Zebrowski's denial of a motion to tax costs. There was no abuse of discretion by the trial court in denying the motion to tax costs and the order is therefore affirmed.

### II. Substantive and Procedural Facts

#### A. *The Allegations of the Third Amended Cross-complaint*

#### 1. *Introduction*

The third amended cross-complaint involved three general areas of allegations. First, it was alleged that various cross-defendants breached a 1977 settlement agreement. These allegations were contained in the first nine causes of action which were each entitled "Breach of Contract." Second, the Attorney General alleged that several individual cross-defendants had conspired to breach their fiduciary duties to FHP. These fiduciary duty claims were contained in the tenth and twelfth causes of action which were entitled "Conspiracy to Breach Fiduciary Obligations." Third, an

---

* While sitting as a law and motion judge in superior court in 1987, the author of this opinion issued orders staying discovery and striking with leave to amend the original cross-complaint in this action. At oral argument before this court, the parties were reminded of this fact and they have expressly consented to the author of this opinion participating in this case.

[1] The parties describe FHP, Inc., as a health maintenance organization. For the purposes of this opinion, we adopt the term used to describe such organizations in California statutes: "health care service plan."

accounting firm was the subject of a negligence claim in the eleventh cause of action.

## 2. *The Allegations*

■ Because this is an appeal from a dismissal order following the sustaining of a demurrer without leave to amend, we accept as true the allegations of the third amended cross-complaint, except contentions, deductions or conclusions of fact or law. (*Serrano* v. *Priest* (1971) 5 Cal.3d 584, 591 [96 Cal.Rptr. 601, 487 P.2d 1241, 41 A.L.R.3d 1187].) FHP, Inc. (FHP), was, prior to November 1985, a California corporation created and existing under the General Non-profit Corporation Law. FHP held funds and other assets in trust for charitable purposes. The officers and directors of FHP, most of whom were also owners of or partners in various ventures named as cross-defendants,[2] engaged in nine separate self-dealing transactions between 1980 and 1985 resulting in a loss to the charitable corporation and its beneficiaries of over $80 million. These self-dealing transactions were entered into without prior notice to or the written approval of the Attorney General as required under the terms of a settlement agreement of a 1977 lawsuit and therefore constituted a breach of that settlement agreement.

In February 1977, then-Attorney General Evelle J. Younger on behalf of the People of the State of California filed suit against FHP, PLC, PERCO, FVLDC, MCBC, DA, Gumbiner, Klaus, and Sweeney, among others, for restitution, damages, surcharge and removal of trustees, enforcement of a charitable trust, and for injunctive and other equitable relief. (People v. Gumbiner, L.A. Super. Ct. No. C 190441.) In April 1977, the parties entered into a settlement agreement resolving that lawsuit. In addition to requiring the repayment of monies to FHP by the other defendants, the settlement agreement provided that FHP would be subject to the Attorney

---

[2] The ventures named as cross-defendants in the Attorney General's third amended cross-complaint and which were doing business in Los Angeles County are: HMO Health Group, Inc. (HHG), a Delaware for-profit corporation; Laguna Hills Associates (LHA), a limited partnership; Plaza Land Corporation (PLC), a California for-profit corporation; Medical Center Building Company (MCBC), a limited partnership; Anaheim Building Associates (ABA), a limited partnership; Downtown Associates (DA), a limited partnership; Physicians Equipment Rental Company (PERCO), a limited partnership; and Fountain Valley Land Development Company (FVLDC), a limited partnership.

The officers and directors of FHP named in the pleading are: Robert Gumbiner, an officer and/or director of FHP, an owner of HHG and PLC, and a partner in LHA, MCBC, ABA, DA, PERCO, and FVLDC; W.W. Price III, an officer and/or director of FHP, an owner of HHG, and a partner in ABA; David LeSueur, an officer and/or director of FHP, and an owner of HHG; Gunther Klaus, an officer and/or director of FHP, a partner in LHA, MCBC, ABA, DA, and FVLDC; Irene Sweeney, a director of FHP; Alfred Schmid, a director of FHP and a partner in ABA; William Hood, a director of FHP. For convenience, we refer to the FHP cross-defendants collectively as FHP.

General's supervision pursuant to the General Non-profit Corporation Law (former Corp. Code, § 9000 et seq.), specifically Corporations Code section 9505, and the Uniform Supervision of Trustees for Charitable Purposes Act (Gov. Code, § 12580 et seq.). Those statutes are discussed below.

The settlement agreement also provided as follows: "[N]o officer or director of Family Health Program, Inc.,[3] nor any corporation, partnership, or business entity of any kind in which any officer or director of Family Health Program, Inc., holds any financial interest, shall contract or have any business or financial dealings with Family Health Program, Inc., without prior notice to and express written approval of the Attorney General. Said provision shall not, however, preclude any individual defendant herein from receiving reasonable compensation for services rendered solely to Family Health Program, Inc., as an officer, director, or employee thereof . . . ."[4]

In addition, the third amended cross-complaint alleged that beginning in 1983, the officers and directors of FHP conspired to breach their fiduciary duty to FHP by undervaluing FHP's assets and then converting from a non-profit to a for-profit corporation and making a public offering of the newly formed corporation "thereby securing the true fair market value of FHP for their own account."[5] It was further alleged that cross-defendant Ernst & Whinney, a partnership doing business in California, negligently appraised FHP's assets so as to substantially undervalue them to the detriment of FHP's charitable beneficiaries, or conspired to undervalue FHP's assets.

B. *Procedural History of the Present Case*

In 1985 FHP amended its articles of incorporation to provide for conversion of FHP from a nonprofit to a for-profit corporation and sought and obtained the requisite approval of the conversion by the Department of Corporations, hereafter referred to as the Department. (Corp. Code, §§ 5813.5, 10821; Health & Saf. Code, § 1352, subd. (b).) A competitor, Maxicare Health Plan Inc. (Maxicare), filed a petition for peremptory writ of mandate in the superior court alleging that the conversion would allow FHP's directors to acquire ownership of FHP for a price well below the fair market value of FHP's assets, thereby diverting substantial assets pledged

---

[3] The parties have on appeal treated FHP, Inc., and Family Health Program, Inc., as one and the same entity without discussing the difference in the titles used. We assume, therefore, that they are one and the same entity.

[4] A supplemental agreement was entered into between the parties in December 1977. The terms of that agreement have no bearing on the dispute in this lawsuit.

[5] Health care service plan conversions from nonprofit to for-profit status are authorized by Corporations Code section 5813.5, subject to the approval of the Commissioner of the Department of Corporations (Corp. Code, §§ 5813.5, 10821; Health & Saf. Code, § 1352, subd. (b)).

for charitable purposes. Maxicare further alleged that it had offered to purchase FHP's assets, but that the Department had refused to act on the offer. Maxicare sought a writ of mandate commanding that the Department withdraw its approval of the conversion, and that the Department and the Attorney General take steps to protect FHP's charitable assets.

The Attorney General filed a cross-petition for writ of mandate and a cross-complaint for breach of contract and declaratory and injunctive relief. The Attorney General alleged the conversion would violate both the law requiring approval or ratification of health plan directors' self-dealing (Corp. Code, § 5233, subd. (d)), and the 1977 settlement agreement described above. The Attorney General sought by his petition to prevent FHP from completing the conversion without the written approval of the Attorney General as required by the 1977 settlement agreement. FHP's answer to the Attorney General's cross-petition and cross-complaint alleged, in part, that the Attorney General lacked jurisdiction, standing or authority to act in connection with FHP's conversion. A temporary restraining order was issued at the request of the Attorney General, but on October 18, 1985, his application for a preliminary injunction was denied. The Attorney General later filed his third amended cross-complaint which was dismissed after general demurrers were sustained without leave to amend. This appeal ensued.[6]

## II. LEGISLATIVE ACTION PERTAINING TO THE ATTORNEY GENERAL'S AUTHORITY TO SUPERVISE AND REGULATE HEALTH CARE SERVICE PLANS.

### A. *Introduction*

The resolution of this appeal is dependent on a fairly complex series of legislative enactments which ultimately granted the power to regulate certain charitable trusts in the health care field to the Commissioner of the Department of Corporations. This legislation, which was introduced in part at the request of former Attorney General Evelle J. Younger, abrogated the Attorney General's common law and statutory authority to supervise charitable trusts in the form of health care service plans. Additionally, various legislative enactments have legalized what the Attorney General's third amended cross-complaint labels self-dealing transactions. Given the obvious importance of these issues, which relate to the power of a state constitutional officer to intervene in the operations of an industry which is essential to

---

[6] In the trial court and on appeal, all parties have relied on various legislative intent materials. Neither in the superior court nor in this court has any party objected to the use of any of the legislative intent materials discussed in this opinion.

the health and welfare of residents of California in order to protect the public interest and the complexity of the changes in the law, it is necessary in this opinion to trace in detail the historical development of the law relating to the power of the Attorney General to regulate health care service plans.

## B. *An Overview*

Historically, the Attorney General has had common law authority to enforce charitable trust obligations. That power was codified in California by the adoption in 1955 of the Uniform Supervision of Trustees for Charitable Purposes Act (Uniform Act) requiring charitable trusts to register with and report to the Attorney General.

As of 1975, nonprofit health care service plans (health plans) holding assets in charitable trust such as FHP were subject to regulation by the Attorney General under several legislative enactments: the Knox-Mills Health Plan Act of 1965 (the Knox-Mills Act), under which health plans were required to register with the Attorney General and to meet minimum tangible net equity requirements; the General Non-profit Corporation Law, and the Corporations for Charitable or Eleemosynary Purposes Law, under which the Attorney General had broad authority to remedy breaches of charitable trusts; and the Uniform Act.

Between 1975 and 1983 the Legislature enacted new legislation and repealed existing legislation with the result that authority to regulate health plans was shifted from the Attorney General to the Department. In 1975, the Legislature repealed the Knox-Mills Act and enacted the Knox-Keene Health Care Service Plan Act of 1975 (the Knox-Keene Act), effective July 1, 1976. The Knox-Keene Act greatly expanded licensing and regulatory authority with respect to health plans. In addition, at the request of then-Attorney General Evelle J. Younger, regulatory authority was transferred from the Attorney General to the Department, which state agency was thought to be better equipped to regulate health plans. As a result, health plans fell under the joint regulation of the Attorney General and the Department.

Joint regulation was greatly decreased as the result of legislative action operative on January 1, 1980. The Legislature repealed the General Non-profit Corporation Law and the Corporations for Charitable or Eleemosynary Purposes Law. It enacted a new Nonprofit Corporation Law under which the Department was granted broad authority with respect to health plans including the authority to bring actions to remedy breaches of a charitable trust and to remedy unauthorized self-dealing transactions.

Authority to intervene in such actions was reserved to the Attorney General. ■ The Legislature's intent in enacting those provisions of the Nonprofit Corporation Law vesting regulatory and oversight authority in the Department was to do away with double regulation of health plans. The Nonprofit Corporation Code also legalized self-dealing transactions by nonprofit organizations such as FHP. The Attorney General had previously taken the position that self-dealing by such nonprofits was per se illegal.

Other aspects of the Attorney General's remaining authority with respect to health plans were also abolished. In 1979, the Legislature, at FHP's urging, exempted health plans from the Uniform Act. In other words, as of 1979 health plans were no longer required to register with the Attorney General as charitable trusts or to meet any other requirements of the Uniform Act. The Legislature concluded that supervision of charitable organizations in the form of health plans had been placed within the purview of the Department and therefore should be exempted from the requirements of the Uniform Act. ■ In 1983, the Legislature repealed the provisions of the Corporations Code which had reserved to the Attorney General the right to intervene in actions concerning breach of charitable trust and self-dealing by health plans. The intent of this legislation was to ensure that sole regulatory authority was vested in the Department.

C. *The Attorney General's Common Law Authority to Enforce Charitable Trust Obligations*

As noted previously, FHP held funds and other assets in trust for charitable purposes. The Attorney General's common law authority to supervise charitable trusts and to maintain actions to protect the public interest therein is well established. "In England the records show that even before the enactment of the Statute of Charitable Uses in 1601 suits were brought by the Attorney-General to enforce charitable trusts." (4A Scott on Trusts (4th ed. 1989) § 391, p. 357.) The common law rule survived unchanged in California. As the Supreme Court stated in *People* v. *Cogswell* (1896) 113 Cal. 129, 136 [45 P. 270], "The state, as *parens patriae,* superintends the management of all public charities or trusts, and, in these matters, acts through [the] attorney general."

Today, with most of the law of this state in codified form, the Attorney General's common law authority to supervise charitable trusts continues to be recognized. For example, current Government Code section 12598, subdivision (a), a provision of the Uniform Supervision of Trustees for Charitable Purposes Act (Gov. Code, § 12580 et seq.) provides: "The primary responsibility for supervising charitable trusts in California, for insuring compliance with trusts and articles of incorporation, and for protection of

assets held by charitable trusts and public benefit corporations, resides in the Attorney General. The Attorney General has broad powers under common law and California statutory law to carry out these charitable trust enforcement responsibilities. . . ."

### D. Codification of the Attorney General's Authority to Supervise Charitable Trusts

At common law there were no requirements that charitable trusts register or be licensed, or meet reporting requirements of any kind. By the 1950's it became widely recognized that intentional or negligent misuses of charitable trusts were an all too common problem. (Bell, Supervision of Charitable Trusts in California (1980) 32 Hastings L.J. 433, 435.) In response to this problem, states began enacting statutes requiring trustees of charitable trusts to account to the state attorney general. (*Id.* at pp. 435-436.) In 1954, the National Conference of Commissioners on Uniform State Laws approved the Uniform Supervision of Trustees for Charitable Purposes Act. In 1955, California became the first state to adopt the Uniform Act. (Stats. 1955, ch. 1820, § 1, p. 3357, repealed by Stats. 1959, ch. 1258, § 1, p. 3396; current version at Gov. Code, § 12580, et seq., added by Stats. 1959, ch. 1258, § 2, p. 3396, eff. June 30, 1959.) (32 Hastings L.J. at pp. 436-437.)

The Uniform Act as adopted in California requires charitable trusts to register with the Attorney General's office, and to file periodic reports concerning the administration of assets held in trust. (Gov. Code, §§ 12584, 12585, 12586.) The Attorney General may investigate charitable organizations to verify that the purposes of the trust are being carried out (Gov. Code, § 12588) and can enforce compliance with the statute by instituting judicial proceedings (Gov. Code, § 12591). The Uniform Act provides that the Attorney General's participation is required in any suit to modify or to terminate a charitable trust. (Gov. Code, § 12591.)

### E. Legislative Action Which Shifted Authority to Regulate Health Care Service Plans From the Attorney General to the Commissioner of the Department of Corporations

Prior to 1976, charitable trusts in the form of nonprofit health care service plans (health plans) were subject to regulation by the Attorney General under several legislative enactments: the Knox-Mills Health Plan Act of 1965 (former Gov. Code, §§ 12530-12539.7); the General Non-profit Corporation Law (former Corp. Code, §§ 9000-9802); the Corporations for Charitable or Eleemosynary Purposes Law (former Corp. Code, §§ 10200-10208); and the Uniform Act, discussed above. First, the Knox-Mills Health Plan Act of 1965 (the Knox-Mills Act) specifically governed health

plans. Under the Knox-Mills Act, health plans were required to register with the Attorney General, and to meet minimum tangible net equity requirements. In addition, the Attorney General was empowered to enforce prohibitions against fraudulent advertising. (Sen. Com. on Health and Welfare, Analysis of Assem. Bill No. 138 (Knox) (1975-1976 Reg. Sess.) as amended June 27, 1975, p. 1.) The Knox-Mills Act was repealed in 1975 effective July 1, 1976. (Stats. 1975, ch. 941, § 1, p. 2070.)

Second, broad authority to oversee nonprofit corporations subject to trusts was granted to the Attorney General under the General Nonprofit Corporation Law which provided in part: "A nonprofit corporation which holds property subject to any public or charitable trust is subject at all times to examination by the Attorney General, on behalf of the State, to ascertain the condition of its affairs and to what extent, if at all, it may fail to comply with trusts which it has assumed or may depart from the general purposes for which it is formed. In case of any such failure or departure the Attorney General shall institute, in the name of the State, the proceedings necessary to correct the noncompliance or departure." (Former Corp. Code, § 9505.) In addition, upon the dissolution of a nonprofit corporation which held its assets in trust or was organized for a charitable purpose, the assets of the corporation were disposed of "in such manner as may be directed by decree of the superior court . . . upon petition therefor by the Attorney General or any person concerned in the liquidation, in proceedings to which the Attorney General is a party." (Former Corp. Code, § 9801.) The General Nonprofit Corporation Law was repealed in 1978 effective January 1, 1980. (Stats. 1978, ch. 567, § 9, p. 1924.)

Third, the Corporations for Charitable or Eleemosynary Purposes Law governed nonprofit corporations organized for the purpose of "receiving, acquiring, holding, managing, administering, and expending property and funds for charitable and eleemosynary purposes . . . ." (Former Corp. Code, § 10200.) Pursuant to section 10207 thereof, "[e]ach such corporation [was] subject at all times to examination by the Attorney General, on behalf of the State, to ascertain the condition of its affairs and to what extent, if at all, it may fail to comply with trusts which it has assumed or may depart from the general purpose for which it is formed. In case of any such failure or departure the Attorney General shall institute, in the name of the State, the proceedings necessary to correct the noncompliance or departure. Except as specially approved by the Attorney General such a corporation shall not accumulate income for a period longer than five years."

The Corporations for Charitable or Eleemosynary Purposes Law was repealed in 1978 effective January 1, 1980. (Stats. 1978, ch. 1305, § 6, p.

4268.) Current Corporations Code section 10200 provides as follows: "Every corporation organized or existing under [the Corporations for Charitable or Eleemosynary Purposes Law] in effect on December 31, 1979, is subject to and deemed to be a nonprofit public benefit corporation organized for charitable purposes under [the Nonprofit Public Benefit Corporation Law] of the Nonprofit Corporation Law . . . except if the corporation is organized primarily or exclusively for religious purposes. . . ." The Nonprofit Public Benefit Corporation Law is discussed below.

### 1. *The Knox-Keene Health Care Service Plan Act of 1975*

In 1975, a greatly expanded licensing and regulatory structure governing health plans and transferring regulatory authority from the Attorney General to the Department, Assembly Bill No. 138, was enacted as the Knox-Keene Health Care Service Plan Act of 1975 (the Knox-Keene Act), Health and Safety Code sections 1340 et seq. (Stats. 1975, ch. 941, § 2, p. 2070.) The substantive provisions of the Knox-Keene Act were effective on July 1, 1976. The Knox-Mills Act was contemporaneously repealed. (Stats. 1975, ch. 941, § 1, p. 2070.) (As noted previously, the Knox-Mills Act gave the Attorney General wide-ranging powers to regulate health plans.)

The Legislature set forth the powers of the Department in Health and Safety Code section 1346. Included is the power to recommend and propose enactment of legislation concerning health plans in the interests of the public, to provide information to federal and state legislative committees and executive agencies concerning health plans, to assist and advise federal, state and local agencies and officials to protect and promote the public interest in health plans, to study, investigate, research and analyze matters affecting health plans, to hold public hearings, subpoena witnesses, and compel production of evidence to enforce the Knox-Keene Act, to conduct audits and examinations of health plans, and to advise the Governor on matters affecting health plans. In addition, the Knox-Keene Act expressly conferred upon the Department the authority to license health plans (Health & Saf. Code, §§ 1349-1356) and health plan solicitors (former Health & Saf. Code, §§ 1357-1358), to enforce prohibitions against false or misleading advertising (Health & Saf. Code, §§ 1360-1361), to review disenrollment decisions (Health & Saf. Code, § 1365, subd. (b)), to require annual reports regarding financial status (Health & Saf. Code, § 1383), to conduct on-site surveys to assess the quality of medical services being administered (Health & Saf. Code, § 1380), to "approve, disapprove, suspend, or postpone the effectiveness of" any "material modification" of a health plan or its operation (Health & Saf. Code, § 1352, subd. (b)), and to enforce through disciplinary and other enforcement measures the law regarding operation of health plans (Health & Saf. Code, § 1386 et seq.).

The legislative history of the Knox-Keene Act explained the decision to transfer regulatory authority from the Attorney General to the Department. According to the analysis of the act by the Assembly Committee on Health, the legislation "was drafted by the Attorney General to divest his office of the Knox-Mills authority. The reason advanced for making such a switch is that 'the Attorney General's office is not a regulatory agency, and lacks the staff resources to adequately perform such a task.'" The official analysis by the Assembly Committee on Health summarized the legislation as "[v]est[ing] all authority in [the] Department of Corporations." (Assem. Com. on Health, Analysis of Assem. Bill No. 138 (1975-76 Reg. Sess.) (Apr. 23, 1975) p. 1.)

The regulatory orientation of the Knox-Keene Act and the vesting of authority in the Department was further explained as follows: "The key issue is whether statutory regulation of health care service plans requires a *financial/business* orientation or a *health* orientation. [Assembly Bill No.] 138 in its original version elected the former approach with extensive and detailed provisions on organizational structure, minimum financial requirements, capitalization and reinsurance, advertising, and solicitation. On the other hand, the March 13th amendments increase the health orientation of [Assembly Bill No.] 138 by adding various provisions strengthening each plan's capability to provide contracted health services. [¶] In the past few years, the financial stability of health plans has become a major concern of the Attorney General as several plans have recently undergone bankruptcy. In many cases, enrollees undergoing treatment at the time of bankruptcy who had prepaid their charges found themselves charged again by plan providers seeking reimbursement for their services. To give health plan regulation a strong business orientation, [Assembly Bill No.] 138 proposes to vest its authority in the Department of Corporations." (*Id.* at p. 6.)

In a letter dated September 11, 1975, from a coauthor of Assembly Bill No. 138, Assemblyman John T. Knox, to then-Governor Edmund G. Brown, Jr., Assemblyman Knox offered the following explanation for the transfer of authority to the Department: "The experience of the Attorney General's office in regulating plans under existing law has demonstrated that proper fiscal management is the most critical aspect in the delivery of this type of quality care. Plans which have failed in the past have invariably entered into unworkable contracts with providers and allowed their indemnity payments to reach financially unacceptable levels. Additionally, since a health care service plan is a high-cost, low-profit business, insolvency can occur in a much shorter period of time than in other types of business. These factors necessitate highly experienced fiscal administrative regulation and enforcement in order to adequately protect the public from abuses relating to plan failure. An example of one of these abuses is found by the

numerous actions in the past filed against plan enrollees by providers of services for costs incurred by the plan. [¶] For these reasons, it is felt that the Commissioner of Corporations is the best possible regulatory agent as he already has responsibility for the regulation of a number of types of businesses which require a staff of persons expert in financial affairs. And, since it is the financial operations of health plans which have been the major source of failure in the past, it is logical to place this regulatory responsibility under him. . . ."

According to then-Attorney General Evelle J. Younger, Assembly Bill No. 138 was "the result of nearly three years of concerted work and study . . . by the authors, Assemblymen Knox and Keene, representatives of the [Department] and members of [the Attorney General's] office. . . ." and "creates a comprehensive system of licensing and regulation under the jurisdiction of the Commissioner of Corporations." (Letter dated September 12, 1975, from Attorney General Evelle J. Younger to Governor Edmund G. Brown, Jr., p. 1.) Former Attorney General Younger continued, "Since a prepaid plan typically acts as a type of holding company, and delivers all of its services to patients through a network of contracts with the actual providers of health care, the extensive experience of the [Department] in regulating businesses and financial institutions is particularly germane to the regulatory needs of this industry." (*Id.* at p. 2.) Finally, the Attorney General stated, "This piece of legislation was introduced partially at my request because both the authors and I feel that a much more comprehensive plan of regulation is necessary to protect the public and to assure public confidence in the concept of prepaid health care." (*Id.* at pp. 2-3.)

### 2. *The New Nonprofit Corporation Law*

With the enactment of the Knox-Keene Act, health plans fell under the joint regulation of the Attorney General—under the General Nonprofit Corporation Law, the Corporations for Charitable or Eleemosynary Purposes Law and the Uniform Act—and the Department—under the Knox-Keene Act. Two years later, in 1978, the Legislature enacted a new Nonprofit Corporation Law, Assembly Bill No. 2180, creating Corporations Code section 5000 et seq., operative January 1, 1980. (Stats. 1978, ch. 567, § 2, p. 1740.) Companion legislation, Assembly Bill No. 2181, created Corporations Code section 10821 et seq. operative January 1, 1980. (Stats. 1978, ch. 1305, § 14, p. 4272.) At the same time, the existing General Nonprofit Corporation Law was repealed, as was the Corporations for Charitable or Eleemosynary Purposes Law. (Stats. 1978, ch. 567, § 9, p. 1924; Stats. 1978, ch. 1305, § 6, p. 4268.)

The new Nonprofit Corporation Law was the result of a joint effort, from 1976 to 1978, of the Assembly Select Committee on Revision of the

Nonprofit Corporation Code and the Special Committee on the Revision of the Nonprofit Corporation Law of the Business Law Section of the State Bar of California. (4 Sen. J. (1979-1980 Reg. Sess.) p. 7005.) The bill "organize[d] existing statutory and common law relating to nonprofit corporations" into the new statutory provisions with some modifications (Legis. Analyst, Analysis of Assem. Bill No. 2180 (1977-1978 Reg. Sess.) as amended August 14, 1978, p. 1.) Under the new Nonprofit Corporation Law, nonprofit corporations operated for public or charitable purposes are termed "nonprofit public benefit corporations," and are governed by the Nonprofit Public Benefit Corporation Law. (Corp. Code, §§ 5060, 5110 et seq.) Oversight and enforcement authority rests with the Attorney General (Corp. Code, §§ 5142, 5223, 5226, 5233, 5250, 5820) *except* with respect to health plans.

A major section of Assembly Bill No. 2181, enacted as Corporations Code sections 10821 to 10826, dealt specifically with the regulation of nonprofit health plans. (Stats. 1978, ch. 1305, § 14, p. 4272.) Consistent with the Knox-Keene Act, Assembly Bill No. 2181 vested oversight and enforcement authority in the Department, reserving the right, however, of the Attorney General to *intervene* in actions to remedy breaches of charitable trust (former Corp. Code, § 10821), actions to remedy unauthorized self-dealing transactions (former Corp. Code, § 10824), and actions to correct noncompliance with trust purposes (former Corp. Code, § 10825).[7]

The sponsor of the legislation, Assemblyman John T. Knox, explained in a letter dated August 31, 1978, to then-Governor Edmund G. Brown, Jr. that "[Assembly Bill No.] 2181 resolves a dual regulation problem for nonprofit health care service plans. These plans, which are already strictly regulated under provisions of the Knox-Keene Health Care Service Plan Act, must under current law be regulated by both the Department of Corporations and the Department of Justice. [Assembly Bill No.] 2181 would place responsibility for regulating health care service plans' compliance with the new nonprofit corporation code with the Commissioner of Corporations who already scrutinizes the plans' compliance with the provisions of Knox-Keene. [Assembly Bill No.] 2181 also preserves the right of the Attorney General to intervene in specified circumstances, but places responsibility for the day-to-day regulation with the Commissioner of Corporations." (Letter dated August 31, 1978, from Assemblyman John T. Knox to Governor Edmund G. Brown, Jr., pp. 1-2.)

---

[7] Former Corporations Code sections 10821, subdivision (a), 10824, subdivision (c), and 10825, authorized the Department to bring actions to remedy breaches of charitable trusts, to remedy unauthorized self-dealing transactions, and to correct noncompliance with trusts. Each statute also provided that notice of any such action "shall" be given to the Attorney General who "may" intervene.

Assembly Bill No. 2181 was supported by FHP and other health plans. They argued that "health care service plans are presently being regulated by both the Attorney General and the Department of Corporations, and . . . this bill will remove onerous double regulations while preserving the right of the Attorney General to intervene in specified circumstances." (Sen. Democratic Caucus, Rep. on Assem. Bill No. 2181 (1977-1978 Reg. Sess.) as amended Aug. 22, 1978.) The proposed legislation was opposed by the Attorney General who reportedly felt that "present methods have been successful and that there is no real duplication." (*Ibid.*)

Another important feature of the new Nonprofit Corporation Law was the authorization of self-dealing transactions[8] previously considered by the Attorney General to be illegal. Under the provisions of the new Nonprofit Corporation Law, self-dealing transactions were legal provided the transactions were approved before or after consummation by the Commissioner or the court "in an action in which the Attorney General is an indispensable party" (former Corp. Code, § 10824, subd. (d)(1)) or the person asserting the validity of the transaction sustained the burden of proof that the transaction was fair to the corporation and was approved or ratified by the board of directors. (Former Corp. Code, § 10824, subd. (d)(2).)[9]

According to the Report of the Assembly Select Committee on Revision of the Nonprofit Corporations Code: "The State Bar Committee spent considerable time on the question of what standards should be applied to transactions between nonprofit corporations and their directors or

---

[8] "[A] self-dealing transaction means a transaction: (1) To which the corporation is a party and in which one or more directors has a material financial interest; or (2) Between a corporation and one or more of its directors or between a corporation and any person in which one or more of its directors has a material financial interest." (Former Corp. Code, § 10824, subd. (a).)

[9] Former Corporations Code section 10824, subdivision (d)(2) specifically provided: "The person asserting the validity of the transaction sustains the burden of proving that: [¶] (A) The corporation entered into the transaction for its own benefit; [¶] (B) The transaction was fair and reasonable as to the corporation at the time the corporation entered into the transaction; [¶] (C) Prior to consummating the transaction or any part thereof the board authorized or approved the transaction in good faith by a vote of a majority of the directors then in office without counting the vote of the interested director or directors, and with knowledge of the material facts concerning the transaction and the director's interest in the transaction. Any other provision of this part notwithstanding, no action by a committee of the board shall satisfy this paragraph; and [¶] (D) Prior to authorizing or approving the transaction the board considered and in good faith determined after reasonable investigation under the circumstances that the corporation could not have obtained a more advantageous arrangement with reasonable effort under the circumstances or the corporation in fact could not have obtained a more advantageous arrangement with reasonable effort under the circumstances." A nearly identical provision was enacted as Corporations Code section 5233 governing nonprofit public benefit corporations generally effective January 1, 1980. (Stats. 1979, ch. 724, § 26, p. 2242.)

corporations in which their directors have a material financial interest. . . . [I]t has been the Attorney General's position that trust rules apply to Public Benefit Corporations [formed for public or charitable purposes] and that no benefit may flow to a director, even if the transaction is fair and reasonable. A majority of the State Bar Committee felt that transactions should be valid if the director could prove they were fair and reasonable in regard to the corporation." (4 Sen. J. (1979-1980 Reg. Sess.) pp. 7005, 7012.) It is that position which is reflected in former Corporations Code section 10824.[10]

### 3. *The Uniform Supervision of Trustees for Charitable Purposes Act*

With the passage of the Knox-Keene Act and Assembly Bill No. 2181, supervision of health plans was placed squarely in the hands of the Department. The Attorney General, however, retained some authority to regulate charitable organizations that are health plans under the Uniform Act: (1) the authority to register charitable trusts (Gov. Code, §§ 12584, 12585); and (2) to institute proceedings to insure compliance with the Uniform Act (Gov. Code, § 12591).[11] (Assem. Health Committee, Analysis of Assem. Bill No. 1717 (1979-1980 Reg. Sess.) May 21, 1979, pp. 1-2.)

In 1979, FHP supported legislation to amend the Uniform Act. The legislation amended Government Code section 12583 to expressly exempt health plans that are licensed by the Department pursuant to the Knox-Keene Act from registration with the Attorney General as charitable trusts. (Stats. 1979, ch. 186, § 1, p. 413.) The legislation also was supported by the Department and Kaiser Foundation Health Plan. (Enrolled Bill Memorandum to Governor, Assem. Bill No. 1717, June 28, 1979, p. 1.)

According to the analysis of the legislation by the Assembly Health Committee, FHP felt that "the enactment . . . of [Sections 10820 et seq.] of the Corporations Code regulating non-profit [health plans] represents legislative intent to reserve the right of supervision of those charitable organizations that are [health plans] to the Commissioner of Corporations. It is

---

[10] The position ultimately adopted was the result of over six months' negotiation between the Charitable Trust Unit of the Attorney General's Office and the State Bar Committee. The Attorney General accepted the compromise position upon the advice of his staff that "if we do not accept this draft, the [State Bar] Committee will probably seek to impose general corporation self-dealing rules which are far less stringent." (Memorandum from Assistant Attorney General Warren J. Abbott to Attorney General Evelle J. Younger dated Mar. 27, 1978.) The Attorney General supported and urged the adoption of the bill. (Letter from Evelle J. Younger to Assemblyman John Knox dated Apr. 12, 1978.)

[11] In addition, the Attorney General then had authority to file actions for dissolution of public benefit corporations including health plans pursuant to Corporations Code sections 6510 and 6511. As discussed later in part (II)(E)(4) of this opinion, this authority with respect to health plans was transferred to the Department in 1983.

therefore the desire of the sponsors to be exempted from the [Uniform Act] which include[s] [Government Code sections 12584 and 12591]. This bill would exempt Knox-Keene [health plans] from that act and therefore those provisions." (Assem. Health Com., Analysis of Assem. Bill No. 1717 (1979-1980 Reg. Sess.) (May 21, 1979) p. 2.) In other words, the amendment of Government Code section 12583 to exempt health plans from the Uniform Act meant that charitable organizations that are health plans were no longer required to register with the Attorney General (Gov. Code, § 12584), or to otherwise comply with the Uniform Act (Gov. Code, § 12591).

The Assembly Health Committee analysis states further that: "The regulation of charitable organizations in this state, in the past, was primarily within the jurisdiction of the Attorney General who was authorized to adopt regulations to carry out the statutory grant of authority. Chapter 1305 reorganized the non-profit corporation law and retained for the most part the authority of the Attorney General to supervise non-profit corporations, but also established specific criteria for the supervision of self-dealing transactions of the directors of non-profit corporations. [¶] Non-profit [health plans] however were exempted from the Attorney General's supervision in certain areas including seeking compliance for a breach of charitable trust and provisions affecting the regulation of self-dealing transactions. Those matters were put within the purview of the Commissioner of Corporations. [¶] The sponsor of this bill in the past was the subject of an Attorney General's investigation which resulted in a stipulated agreement including, among other things, the necessity for the sponsor to seek approval by the Attorney General of transactions that could be construed as self-dealing. The sponsor feels that since the criteria for self-dealing is now set forth in new law that the Attorney General's residual authority regarding compliance of charitable trusts should be dissolved. The issue that is not addressed is whether the exemption of the sponsor from authority of the Attorney General in all instances except for a petition of involuntary dissolution is justified. This bill would exempt non-profit [health plans] from registering as charitable trusts and providing the Attorney General with the information needed to determine if independent action by the Attorney General would be justified, notwithstanding the duty of noticing the Attorney General if other parties bring actions against a charitable trust. In addition, the bill may nullify the agreement between the sponsor and the Attorney General regarding the sponsor's duty to have the Attorney General approve transactions that could be construed as self-dealing." (Assem. Health Com. Analysis of Assem. Bill No. 1717 (1979-1980 Reg. Sess.) May 21, 1979, pp. 2-3.)

The corporate counsel of Family Health Program, Inc., Burt Gelber, submitted a letter on Assembly Bill No. 1717 on May 21, 1979. According

to Mr. Gelber, the legislation was intended to eliminate a potential conflict as to which state agency, the Attorney General or the Department, would supervise nonprofit health plans in regard to their compliance with the Nonprofit Corporation Law, particularly as to self-dealing transactions. Mr. Gelber outlined the history of the law governing self-dealing by health plans. Under previous statutes, a charitable corporation as defined in Government Code section 12582.1, as opposed to a nonprofit corporation, was, in the opinion of the Attorney General, *prohibited* by Civil Code section 2230 from engaging in self-dealing transactions, i.e., "contractual arrangements between the corporation and entities in which principles of the corporation had an interest." (Letter from Bernard Gelber contained in files of Assem. Health Comm. (May 21, 1979) p. 2.) The Attorney General characterized at least some if not all health plans as charitable corporations. As a result, the Attorney General considered self-dealing transactions by such health plans to be illegal. (*Id.* at pp. 2-5.)

In a June 22, 1979, letter accompanying the bill for signature by then-Governor Edmund G. Brown, Jr., the sponsor of the legislation, John T. Knox, described the purpose of the Bill as follows: "[T]o avoid duplication and eliminate a potential conflict with new section 10821 of the Corporations Code, effective January 1, 1980, which gives the Corporations Commissioner exclusive initial jurisdiction to police compliance with standards governing [health plans] organized under the public benefit provisions of the new [Nonprofit Corporations Law]." (Letter from Assemblyman John T. Knox to Governor Edmund G. Brown, Jr. (June 22, 1979) p. 1.)

As discussed above, the new Nonprofit Corporation Law legitimized self-dealing transactions by health plans and placed enforcement authority with the Department (with the Attorney General having a right of intervention). The Attorney General, however, retained authority pursuant to the Uniform Act to bring actions to correct violations of charitable corporation or trust rules. (Gov. Code, § 12591.) Assembly Bill No. 1717 insured that the Legislature's intent to grant the Department authority to police self-dealing by health plans would not be usurped by the Attorney General.

### 4. *Repeal of Corporations Code Section 10822 et seq.*

Finally, in 1983, the Legislature enacted Assembly Bill No. 795 which repealed Corporations Code sections 10822 through 10826 (Stats. 1983, ch. 1085, §§ 10 to 14, p. 3879) and rewrote Corporations Code section 10821 to read: "Notwithstanding any other provision of this division, as to a health care service plan which is formed under or subject to [the Nonprofit Public Benefit Corporation Law] . . . , all references to the Attorney General contained in [the Nonprofit Public Benefit Corporation Law] shall, in the

case of health care service plans, be deemed to refer to the Commissioner of Corporations" (Stats. 1983, ch. 1085, § 9.5, p. 3879). The effect of this amendment was to divest the Attorney General of statutory authority to intervene in actions concerning breach of charitable trusts and self-dealing by health plans, and to vest sole regulatory authority over health plans in the Department, including the authority to oversee enforcement of charitable trusts (Corp. Code, § 5142), liability for self-dealing transactions (Corp. Code, § 5233), and to bring actions to dissolve health plans (Corp. Code, §§ 6510, 6511). Corporations Code section 5250 now provides: "A [health plan] is subject at all times to examination by the [Commissioner of Corporations], on behalf of the state, to ascertain the condition of its affairs and to what extent, if at all, it fails to comply with trusts which it has assumed or has departed from the purposes for which it is formed. In case of any such failure or departure the [Commissioner of Corporations] may institute, in the name of the state, the proceeding necessary to correct the noncompliance or departure."

The intent of the bill was to end unnecessary duplication of responsibility in state government with respect to health plan regulation. (Assem. Judiciary Com., Rep. on Assem. Bill No. 795 (Stirling) (1983-1984 Reg. Sess.) as amended Aug. 26, 1983, p. 1; Sen. Insurance, Claims and Corporations Com. (Alan Robbins, Chairman), Analysis of Assem. Bill No. 795 (1983-1984 Reg. Sess.) as amended August 15, 1983, p. 2; Sen. Republican Caucus (John Seymour, Chairman), Report on Assem. Bill No. 795 as amended August 26, 1983, p. 2.) The Legislative Analyst's analysis of Assembly Bill No. 795 stated that the bill "[s]uspends the authority of the Attorney General to regulate nonprofit health care service plans . . . , and transfers sole regulatory authority to the Commissioner of Corporations . . . ." (Legis. Analyst, Analysis of Assem. Bill No. 795 (1983-1984 Reg. Sess.) as amended August 26, 1983, pp. 2-3.) There is no record of opposition to the bill.

On June 24, 1980, Deputy Attorney General James R. Schwartz sent a letter to Mark Richelson, Senior Corporations Counsel, Department, expressing the following position with respect to the 1977 settlement agreement between FHP and the Attorney General's office: "A final review of our files relating to prepaid health plan matters indicates that in three cases [including FHP] our settlement agreements involve long term provisions which will require future oversight to insure continued compliance. In that your department will be receiving all relevant financial data under the Knox-Keene Act and has ongoing charitable trust jurisdiction over these plans, it appears logical that such future monitoring of the settlement agreements be done by your audit staff in the normal course of their periodic

review." (Letter from Deputy Attorney General James P. Schwartz to Senior Corporations Counsel Mark Richelson (June 24, 1980), p. 1.)

F. *Recent Attempts to Pass Legislation Authorizing Involvement by the Attorney General in Conversion of Health Plans From Nonprofit to For-profit status*

As noted above, the Legislature has vested in the Department authority to approve health plan conversions from nonprofit to for-profit status. (Corp. Code, §§ 5813.5, 10821; Health & Saf. Code, § 1352, subd. (b).) In recent years, legislation has twice been introduced which would divest the Department of authority to determine the fair market value of assets involved in the conversion of health plans from nonprofit to for-profit status, and vest that authority in the Attorney General. The two bills were Assembly Bill No. 520 (McAlister) introduced February 4, 1985, and Senate Bill No. 1640 (Keene) introduced March 6, 1987. Neither bill was enacted. The Department of Finance opposed Assembly Bill No. 520 on the grounds that (1) it "[d]uplicates an existing program of the Department of Corporations"; (2) "[a]ny problems with [the] existing system should be addressed administratively through the Department of Corporations"; (3) it is "[u]nclear that [the] Department of Justice could do a better job"; and (4) it "[a]ttempts to fund various state programs using revenue generated from the conversion of nonprofit health care plans, thus reducing funds available for charitable purposes." (Memo. from Dept. of Fin., Michael Carter, Principal Analyst, to Assemblyman Alister McAlister (July 31, 1986), p. 1.)

III. DISCUSSION

A. *The Legislature Has Superseded the Attorney General's Common Law Authority to Oversee Health Plans*

The Attorney General's third amended cross-complaint alleged that "[o]n behalf of the state as *parens patriae,* the Attorney General represents the people of this state who are the ultimate beneficiaries of all assets held upon a charitable trust," and has common law authority to "oversee and protect all nonprofit corporations with assets held in charitable trust, and to enforce compliance by FHP and its directors with their obligations as charitable trustees." ██ We are not bound to accept as true conclusions of law set forth in a pleading. (*Serrano* v. *Priest, supra,* 5 Cal.3d at p. 591.) ██ The Attorney General contends that it was error to sustain FHP's and Ernst & Whinney's demurrers without leave to amend because despite the statutory grant of authority to the Department, the Attorney General retains common law authority to protect the public interest by bringing actions for breaches of charitable trusts. FHP and Ernst &

Whinney contend, on the other hand, that the Legislature intentionally eliminated the Attorney General's common law power to regulate health plans.

■ The Supreme Court has held that the Attorney General does not have an unrestrainable common law right to sue in his role as the People's counsel; the common law practice can be superseded by constitutional or statutory provisions. (*People* ex rel. *Deukmejian* v. *Brown* (1981) 29 Cal.3d 150, 157 [172 Cal.Rptr. 478, 624 P.2d 1206].) In *Brown*, the court concluded that the Attorney General could not maintain a lawsuit against public officials and agencies when the Attorney General's view of the public interest as reflected in the lawsuit was contrary to the views of the Governor. The court reasoned that the Governor, pursuant to article V, section 1, of the California Constitution has " 'supreme executive power' " to determine the public interest. (*Id.* at pp. 157-158.) We turn to the question of how to determine whether a common law practice has been superseded by statute.

■ The general rule as stated by the Supreme Court is that "statutes do not supplant the common law unless it appears that the Legislature intended to cover the entire subject or, in other words, to 'occupy the field.' [Citations.] '[G]eneral and comprehensive legislation, where course of conduct, parties, things affected, limitations and exceptions are minutely described, indicates a legislative intent that the statute should totally supersede and replace the common law dealing with the subject matter.' [Citation.]" (*I. E. Associates* v. *Safeco Title Ins. Co.* (1985) 39 Cal.3d 281, 285 [216 Cal.Rptr. 438, 702 P.2d 596].) In *I. E. Associates,* the Supreme Court affirmed a summary judgment in favor of a trustee of a deed of trust in an action for damages brought by the trustor who had failed to receive notice of default before its property was sold through a nonjudicial foreclosure. The trustee had given notice to the trustor in accordance with Civil Code section 2924b by mailing notice of default to the trustor's last known address. The trustor argued that the trustee had a common law duty, in addition to the notice procedures proscribed by statute, to take reasonable steps to provide actual notice to the defaulting trustor.

The Supreme Court found that the statutes governing nonjudicial foreclosure covered "every aspect of exercise of the power of sale contained in a deed of trust." (39 Cal.3d 281, 285.) The court concluded that the statutory procedures in the Civil Code governing notice on nonjudicial foreclosure were "the exclusive source of rights, duties and liabilities. [Fn. omitted.]" (*Ibid.*) The inclusiveness of the statutory scheme supported the conclusion that the Legislature had intended to cover the entire subject and to supersede the common law dealing with notice of nonjudicial foreclosure. (*Id.* at pp. 285, 288.)

Our Supreme Court reviewed another statutory scheme to ascertain the legislative intent regarding common law rights and duties in *Pacific Scene, Inc.* v. *Peñasquitos, Inc.* (1988) 46 Cal.3d 407, 410-411 [250 Cal.Rptr. 651, 758 P.2d 1182]. In *Pacific Scene, Inc.* a builder sued a dissolved corporation whose demurrer was sustained without leave to amend. The Supreme Court held that the builder could not maintain an action based upon a common law "trust fund" theory against the shareholders of a dissolved corporation because the Legislature had "generally occupied the field with respect to the remedies available against the former shareholders of dissolved corporations, thus preempting antecedent common law causes of action. . . ." (*Id.* at pp. 409-410.) The legislation in question, sections 1800 to 2011 of the Corporations Code, comprised "a broad and detailed scheme regulating virtually every aspect of corporate dissolution." (*Id.* at p. 411.) Further, two sections specifically governed the assertion of claims against former shareholders of dissolved corporations. (*Ibid.*) The court concluded that the Legislature had "occupied the field and precluded resort to dormant common law doctrines for the provision of extra-statutory relief." (*Id.* at p. 413.)

 The Legislature's intent to occupy the field is equally apparent in the case now before us. The statutes governing the regulation and supervision of health plans represent a comprehensive system of licensing and regulation under the jurisdiction of the Department. All of the statutory authority once granted to the Attorney General has been stripped away and is now expressly vested in the Department. All aspects of the regulation of health plans are covered, including financial stability, organization, advertising and capability to provide health services. Under the Knox-Keene Act (Health & Saf. Code, § 1340 et seq.) the Department has broad authority to protect and promote the public interest in health plans.

The Attorney General's authority to bring legal action with respect to health plans, or even to intervene in such actions, has been purposely omitted from the relevant statutes. ██ ██ Express provisions of the Nonprofit Public Benefit Corporation Law now grant the Department sole authority to enjoin or otherwise remedy breaches of charitable trust (Corp. Code, §§ 5142, 5250, 10821), to approve self-dealing transactions, and to remedy unauthorized self-dealing (Corp. Code, §§ 5233, 10821).[12]

---

[12] "The Attorney General has charge, as attorney, of all legal matters in which the State is interested, *except* the business of . . . such . . . boards or officers as are by law authorized to employ attorneys." (Gov. Code, § 12511, italics added; Gov. Code, § 11042.) Corporation Code section 25606 as amended in 1977 empowers the Department to employ its own counsel. (Stats. 1977, ch. 762, § 7.6, p. 2376.) Accordingly, the Department is excepted from the requirement (Gov. Code, § 11042) that the Attorney General act as counsel for state agencies.

 The legislative history of the relevant enactments is consistent with the conclusion that the Legislature intended to vest all authority to regulate and supervise health plans in the Department and to supersede any common law authority regarding regulation and supervision of such organizations by the Attorney General.[13] With each of the enactments and amendments described in detail above, the Legislature gradually divested the Attorney General of authority to regulate and supervise health plans. The legislative history is replete with references to the transfer of authority from the Attorney General to the Department and the elimination of problematic dual responsibility and onerous dual regulation. If this court were to find that the Attorney General had common law authority to remedy breaches of charitable trust and self-dealing by health plans, we would write back into the law the very duality the Legislature sought to eradicate.

The legislative history reveals that the first seed was planted by then-Attorney General Evelle J. Younger whose opinion it was that the Department was better qualified to take on regulatory responsibility for health plans. The Attorney General recognized the Department's extensive experience in regulating business and financial institutions. The legislative history emphasizes the Department staff's expertise in financial affairs and its experience in fiscal administrative regulation and enforcement.

The Legislature has comprehensively vested in the Department the power and duty to regulate health plans and to protect the public interest. We conclude that the Legislature in granting statutory authority to regulate and supervise health plans to the Department intended to occupy the field and to supplant the Attorney General's common law authority with respect to such plans.

B. *The Attorney General Has No Authority to Enforce the 1977 Settlement Agreement*

The question remains whether the settlement agreement entered into in 1977 between the Attorney General, acting on behalf of the People of this state, and FHP survives the Legislature's elimination of the Attorney General's authority and the transfer of that authority to the Department. The

---

[13] A statute's legislative history, including committee and commission reports, may be considered in ascertaining the meaning of a statute. Our Supreme Court has held, "[I]t is reasonable to infer that those who actually voted on the proposed measure read and considered the materials presented in explanation of it, and that the materials therefore provide some indication of how the measure was understood at the time by those who voted to enact it." (*Hutnick* v. *United States Fidelity & Guaranty Co.* (1988) 47 Cal.3d 456, 465, fn. 7 [253 Cal.Rptr. 236, 763 P.2d 1326].)

Attorney General contends that the settlement agreement provides "an independent basis upon which [he] may base his action to correct breaches of charitable trust arising from [the FHP defendants'] self-dealing and seek damages from them." FHP argues that its obligations under the 1977 settlement agreement were discharged by operation of law in that the Legislature terminated the Attorney General's jurisdiction over health plans, and enacted provisions authorizing self-dealing transactions by such entities. We find that the 1977 settlement agreement is no longer enforceable by the Attorney General.

 First, we consider whether the Legislature, in transferring regulatory and supervisory authority from the Attorney General to the Department intended to or necessarily superseded the settlement agreement. Second, we consider whether the Attorney General was the proper party under the agreement itself to sue for a breach thereof.[14]

1. *Legislative intent to supersede the 1977 settlement agreement*

We have not been cited to, nor have we found, any California case in which a settlement agreement between a state agency and an entity subject to its authority has come in conflict with subsequently enacted legislation. However, seven United States Supreme Court and circuit court of appeals decisions have addressed the effect of subsequent legislation on decrees or judgments affecting public rights and constitute persuasive authority. In *State of Pennsylvania* v. *Wheeling and Belmont Bridge Co.* (1856) 59 U.S. 421, 429-436 [15 L.Ed. 435, 436-439], the Supreme Court considered the effect of subsequent legislation on an existing injunction. An injunction secured by the State of Pennsylvania barred the Wheeling and Belmont Bridge Co. from maintaining a bridge in a specific spot on the grounds that it was an unlawful structure. A subsequent act of Congress, however, declared the bridge to be a lawful structure. The Supreme Court held it was necessary to dissolve the injunction because the subsequent legislation had eliminated the need for the injunction. (*Id.* at pp. 435-436 [15 L.Ed.2d at p. 439].) In *Hodges* v. *Snyder* (1923) 261 U.S. 600, 603-604 [67 L.Ed. 819, 821-822, 43 S.Ct. 435], the court held that subsequent legislation could annul an injunction against the consolidation of a school district. The court stated: "[A] suit brought for the enforcement of a public right . . . even after it has been established by the judgment of the court, may be annulled by subsequent legislation and should not be thereafter enforced; although, in so far

---

[14] The Attorney General argues that FHP's ability to perform under the settlement agreement was not prevented or delayed by operation of law and therefore, FHP's failure to perform is not excused. (Civ. Code, § 1511.) That argument misses the point. The issue here is not whether FHP's performance was excused, but whether the settlement agreement was enforceable by the Attorney General.

as a private right has been incidentally established by such judgment, as for special damages to the plaintiff or for [her or] his costs, it may not be thus taken away. [Citation.]" (*Ibid.*) Similarly, in *System Federation* v. *Wright* (1961) 364 U.S. 642, 649-651 [5 L.Ed.2d 349, 354-355, 81 S.Ct. 368], the court held that the district court had abused its discretion in refusing to modify a consent decree which was in conflict with subsequently enacted legislation. The consent decree had barred the defendants from discriminating against nonunion employees because of their refusal to join a union. Congress later enacted a law permitting railroads to require union shops. The Supreme Court held that courts must be free to modify consent decrees when a change in the law brings the terms of the consent decree in conflict with statutory objectives. (*Id.* at p. 651.)

*State of Pennsylvania* v. *Wheeling and Belmont Bridge Co., supra,* 59 U.S. 421, and *System Federation* v. *Wright, supra,* 364 U.S. 642, were discussed by the District of Columbia Circuit in two cases. In *Daylo* v. *Administrator of Veterans' Affairs* (D.C. Cir. 1974) 501 F.2d 811, 812, the Administrator of Veterans' Affairs appealed the denial of a motion for relief from a judgment in the nature of mandamus. The Administrator argued that legislation enacted after the judgment became final and unappealable had retroactively withdrawn the jurisdiction of the court to enforce a judgment to pay death benefits to a serviceman's widow. The District of Columbia Circuit held that it was not within the power of the legislature to take away rights vested by a judgment. (*Id.* at p. 816.) The court distinguished *Wheeling and Belmont Bridge, Hodges* and *Wright* as directly affecting *public rights.* Commenting on *Wheeling and Belmont Bridge,* the court stated: "The judgment was vulnerable to retroactive legislation only to the extent that the remedy chosen—an injunctive decree rather than damages at law—directly affected public rights. [Fn. omitted.]" (*Id.* at p. 817.) In the cited cases, "the judicial decrees at issue called for actions which would have directly affected the rights of many persons not privy to the judgments, *i.e.,* would have trenched upon 'public rights.'" (*Id.* at p. 818.) The mandate in the case before the court called merely for payment of a past obligation and was indistinguishable from an award of damages, which is immune from legislative alteration. (*Ibid.*) In the present case, the Attorney General is seeking to protect the public interest and the 1977 settlement agreement was designed to protect the public welfare. Therefore, the settlement was subject to subsequent legislative actions.

In another case from the District of Columbia Circuit, *Environmental Defense Fund, Inc.* v. *Costle* (D.C. Cir. 1980) 636 F.2d 1229, 1238-1245, the court considered whether amendments to the Federal Water Pollution Control Act superseded a settlement agreement between the Environmental Protection Agency and five environmental groups. Specifically, the court

addressed the question of whether Congress had intended the amendments to supplant the settlement agreement. The court outlined the relevant considerations: (1) whether the language and provisions of the amendments expressly stated or necessarily implied that Congress intended to supplant the settlement agreement; and (2) whether clear statements in the legislative history evidenced such intent. (*Id.* at p. 1241.) The court found no clear conflict between the terms of the settlement agreement before it and the subsequent act of Congress. Nor did it find any evidence in the legislative history that Congress intended to supersede the settlement agreement. The court therefore concluded that the legislation did not supersede the agreement. (*Id.* at p. 1244.) In *Ferrell* v. *Pierce* (7th Cir. 1984) 743 F.2d 454, the Department of Housing and Urban Development (HUD) appealed from the denial of its motion to modify a stipulation. HUD argued modification of the stipulation was required because of a subsequent change in the law. (*Id.* at p. 463.) The court recognized the general rule that a change in the law often requires modification of a consent decree or an injunction. (*Id.* at pp. 463-464.) The court found, however, that HUD had not demonstrated that the stipulation was in conflict with the new statute. On the contrary, the court found that Congress had intended not to alter the requirements of the stipulation. (*Id.* at pp. 463-465.)[15]

■ The cases cited in this portion of the opinion support the conclusion that when a government agency enters into a settlement agreement in the public interest with an entity subject to its authority and the agreement comes into clear conflict with subsequently enacted legislation, the legislation controls. A court looks to the language of the legislation and the legislative history to determine whether the Legislature intended to supersede the settlement agreement. ■ Clear conflicts exist between the 1977 settlement agreement and the law of this state as of 1983. First, the settlement agreement states that FHP is subject to the Attorney General's supervision pursuant to Corporations Code section 9505, and the Uniform Act. Corporations Code section 9505 has, however, been repealed [Stats. 1978, ch. 567, § 9, p. 1924], and health plans have been exempted from the

---

[15] State courts which have considered the effect of subsequent legislation on decrees and judgments are in agreement with the federal authorities cited above. (*Casino Ass'n.* v. *Atlantic City* (1985) 217 N.J. Super. 277 [525 A.2d 1109, 1112-1113]; *Partain* v. *City of Royston* (1981) 248 Ga. 420 [284 S.E.2d 15, 16]; *Town of Durham* v. *Cutter* (1981) 121 N.H. 243 [428 A.2d 904, 907]; *Holen* v. *Minneapolis-St. Paul Metropolitan A. Com'n.* (1957) 250 Minn. 130 [84 N.W.2d 282, 288]; *North Common School Dist.* v. *Live Oak County Bd.* (1946) 145 Tex. 251 [199 S.W.2d 764, 766]; *City of Norfolk* v. *Stephenson* (1946) 185 Va. 305 [38 S.E.2d 570, 575, 171 A.L.R. 1344]. Cf. *Inman* v. *Railroad Commission* (Tex.Civ.App. 1972) 478 S.W.2d 124, 128 [legislation corrected error in final orders of state railroad commission]; *Becker* v. *Adams* (1962) 37 N.J. 337 [181 A.2d 349, 351] [repeal of legislation authorizing incorporation of city abated pending proceeding to incorporate city]; *Gaynor* v. *Village of Port Chester* (1916) 174 A.D. 122 [160 N.Y.S. 978, 983-985] [state legislature had power to validate contract for services to village which village board of trustees had no power to make].)

Uniform Act. Moreover, current provisions which parallel Corporations Code section 9505 provide that the Department, and not the Attorney General, is responsible for supervising health plans. Second, the settlement agreement obligated FHP to refrain from self-dealing, while current law authorizes self-dealing by health plans.

FHP does not contend, nor do we find, that the legislation in question contains an explicit declaration that the Legislature intended to supersede the 1977 settlement agreement between the People of the State of California and FHP. The Legislature's intent to supplant the settlement agreement is, however, evidenced by the nine-year course of legislative conduct described in this opinion. The provisions of law upon which the settlement agreement relies as authority to oversee FHP were eliminated by the Legislature. Moreover, the settlement agreement barred FHP from engaging in conduct which, as of 1980, it had a right to pursue.

The legislative history of Assembly Bill No. 1717, which exempted health plans from the Uniform Act, also supports the conclusion that the Legislature intended to supersede the settlement agreement. The bill was sponsored by FHP. The history of FHP's relationship with the Attorney General was before the Legislature at the time the bill was enacted. It was clear that FHP sought to eradicate the Attorney General's residual authority under the Uniform Act to oversee FHP's conduct. The Legislature recognized that enactment of the bill would exempt health plans from providing the Attorney General with information which would be necessary in order for the Attorney General to determine whether an independent action against such an organization was warranted. The Legislature also recognized that the bill could nullify the settlement agreement between FHP and the People of the State of California. (Assem. Health Com. Analysis of Assem. Bill No. 1717 (1979-1980 Reg. Sess.) May 21, 1979, pp. 2-3.)

Finally, the Attorney General's office recognized that the authority and ability to supervise its existing settlement agreements with health plans had shifted, as of 1980, to the Department. The Attorney General conceded that, "In that [the Department] will be receiving all relevant financial data under the Knox-Keene Act and has ongoing charitable trust jurisdiction over [health plans], it appears logical that . . . future monitoring of the settlement agreements [involving long term provisions which require future oversight to insure continued compliance] be done by your audit staff in the normal course of their periodic review." (Letter dated June 24, 1980, from James R. Schwartz, deputy attorney general, to Mark Richelson, senior corporations counsel, Department of Corporations.) We conclude that the provisions of the relevant law as amended, together with statements in the legislative history, establish that the Legislature intended to supplant the

settlement agreement between the People of the State of California and FHP.

2. *The Attorney General cannot in this case represent the real party in interest, the People of the State of California*

■ Even if the Legislature did not supplant the settlement agreement it was unenforceable by the Attorney General because at the time he filed the lawsuit now before us he did not represent the People of the State of California with respect to health plan regulation. Pursuant to Code of Civil Procedure section 367, "Every action must be prosecuted in the name of the real party in interest . . . ." In support of their demurrers to the Attorney General's third amended cross-complaint FHP and Ernst & Whinney argued that the Attorney General lacked standing to sue under the 1977 settlement agreement because he was not the real party in interest. This was a proper ground of demurrer. (*Powers* v. *Ashton* (1975) 45 Cal.App.3d 783, 787 [119 Cal.Rptr. 729].)

The lawsuit which resulted in the 1977 settlement agreement was brought by the People of the State of California by and through the Attorney General. The settlement agreement was entered into between the People and FHP. It follows, therefore, that the real party in interest under the settlement agreement is the People. (Code Civ. Proc., § 367.) The third amended cross-complaint filed in this action which gave rise to this appeal was filed by John K. Van de Kamp, Attorney General of the State of California, in his own name, and not on behalf of the People. Since the Attorney General was not a party to the settlement agreement, he is not the real party in interest, and he cannot maintain a suit to enforce it. (*Ibid.*; *Powers* v. *Ashton, supra*, 45 Cal.App.3d at p. 787.)

Moreover, even if the lawsuit had been filed by the Attorney General on behalf of the People, the Attorney General did not have authority to pursue the action. This is so because the legislation discussed at length above divested the Attorney General of his common law authority to act on behalf of the People in matters concerning health plans. That authority is now vested in the Department. Accordingly, it is the Department which is empowered to enforce the settlement agreement on behalf of the People and we respectfully conclude that the Attorney General does not have the authority to enforce the agreement.

C. *The Trial Court Did Not Abuse Its Discretion in Denying the Attorney General's Motion to Tax Costs*

■ The Attorney General also appeals from the trial court's denial of his motion to tax costs. Following the trial court's dismissal of the com-

plaint in this action, FHP sought to recover its costs, including $3,835.30 for 150 pages of legislative history materials obtained from the Legislative Intent Service (LIS). The Attorney General filed a motion to tax that item of cost on the ground that it was not recoverable as a matter of law. In an uncontroverted declaration, FHP's attorney stated that LIS is "a Sacramento-area organization that accumulates legislative history materials, compiles them in a comprehensible format . . . and forwards them at a fixed fee to persons who request them" and that also offers its services as "legislative history consultants, expert witnesses and investigators based upon an hourly fee." The costs claimed by FHP were "only for compilation and forwarding of legislative history materials and not for advisory, expert or investigative services." In addition, the materials obtained from LIS were not "readily available except through [LIS] (or other similar service)." FHP's attorney concluded that the legislative history materials were "essential" to FHP's demurrer, and that "competent representation of my clients and a thorough presentation of controlling authority to the Court required me to obtain from the Legislative Intent Service the legislative history for which costs are claimed."[16]

The trial court denied the Attorney General's motion to tax costs. The superior court judge found that: "the costs involved were for obtaining documentation of the legislative history, not for legal analysis"; "the legislative history was necessary to construction of the statutes"; "the legislative history documentation was not readily available from any governmental or commercial source in complied [sic] or regularly published form (as legislative history material concerning, for example, a federal statute would be)"; and "the costs were 'reasonably necessary' [under Code Civ. Proc., § ] 1033.5 (c)(2)."

The Attorney General argues on appeal, as he did in the trial court, that "[t]he fees paid to [LIS] were for the convenience of [FHP] and not reasonably necessary to the conduct of the litigation." In addition, the Attorney General contends that the costs at issue were not recoverable because "fees of experts not ordered by the court" and "investigation expenses in preparing the case for trial" are expressly disallowed by Code of Civil Procedure section 1033.5, subdivisions (b)(1) and (b)(2) respectively. We find no abuse of discretion by the trial court in denying the Attorney General's motion to tax costs.

Code of Civil Procedure section 1033.5, enacted in 1986, codified existing case law and set forth the items of costs which may or may not be recoverable in a civil action. (7 Witkin, Cal. Procedure (3d ed. 1985) Judgment

---

[16] FHP's position is supported by LIS as amicus curiae.

(1989 supp.) § 84, pp. 76-77.) Legislative history materials are not listed in subdivision (a) which sets forth items allowable as costs, nor are such materials listed in subdivision (b) which sets forth items not allowable as costs. Subdivision (c)(4) of that section provides, however, that "Items not mentioned in this section and items assessed upon application may be allowed or denied in the court's discretion." That subsection was recently cited by the Court of Appeal for the Fourth Appellate District in affirming the trial court's allowance of arbitrator's fees as costs. (*Cobler* v. *Stanley, Barber, Southard, Brown & Associates* (1990) 217 Cal.App.3d 518, 533 [265 Cal.Rptr. 868].) That court found no abuse of discretion in awarding arbitrator's fees. (*Ibid.*) Similarly, a division of the Court of Appeal for the First Appellate District held that special master fees were properly awarded as costs even though such fees are not specifically listed in Code of Civil Procedure section 1033.5. (*Winston Square Homeowner's Assn.* v. *Centex West, Inc.* (1989) 213 Cal.App.3d 282, 292-293 [261 Cal.Rptr.42x605].) ▆ Accordingly, legislative history material costs are not to be disallowed merely because they are not specifically listed in section 1033.5. The allowance or disallowance of such costs is within the trial court's sound discretion. (Code Civ. Proc., § 1033.5, subd. (c)(4).)

The trial court's discretion under Code of Civil Procedure section 1033.5, subdivision (c)(4) is subject, however, to certain statutory prerequisites to any award of costs. Pursuant to subdivisions (c)(2) and (c)(3), allowable costs must be "reasonably necessary to the conduct of the litigation rather than merely convenient or beneficial to its preparation" and must be "reasonable in amount." The Attorney General does not contend that the costs in question were not reasonable in amount. ▆ We turn, therefore, to the question whether the costs at issue were "reasonably necessary to the conduct of the litigation."

FHP's demurrer to the Attorney General's third amended cross-complaint was based largely on the argument that certain legislative enactments had superseded the Attorney General's common law authority with respect to health plans. Because disclosure of legislative intent as it related to various statutes was essential to the issues in this case, the legislative histories of the enactments were necessary to FHP's demurrer. In connection with that demurrer, FHP requested that the trial court take judicial notice of the legislative materials obtained from LIS. As a result of that request, FHP was required to "[f]urnish[ ] the court with sufficient information to enable it to take judicial notice of the matter." (Evid. Code, § 453, subd. (b).) According to the Law Revision Commission Comment to Evidence Code section 453, "[T]he court is not required to resort to any sources of information not provided by the parties. If the party requesting that judicial notice be taken under Section 453 fails to provide the court with 'sufficient information,' the judge may decline to take judicial notice. . . . The judge

is not required to undertake the necessary research to determine the fact . . . ." (29 B West's Ann. Evid. Code (1966 ed.) § 453, p. 414.) It follows that the legislative materials provided by FHP in connection with its demurrer were necessary to the litigation within the meaning of Code of Civil Procedure section 1033.5, subdivision (c)(2).

Not only was it necessary to furnish the legislative materials to the trial court, but the evidence was uncontroverted that those materials were not readily available to FHP except through LIS or a similar service. It was not an abuse of discretion to allow recovery of costs of materials necessary to the litigation which were readily available only through the source utilized.

We reject the Attorney General's claim that the costs at issue consisted of nonrecoverable expert witness fees or investigation expenses. The evidence was uncontroverted that FHP procured LIS's compilation and forwarding services only, and not its expert witness services. The costs at issue also cannot be characterized as investigation expenses in preparing the case for trial. The legislative histories were crucial materials which FHP was required to provide to the court in connection with its demurrer. Accordingly, the trial court's denial of the Attorney General's motion to tax costs is affirmed.

## IV. DISPOSITION

The judgment of dismissal is affirmed. The order denying the Attorney General's motion to tax costs is affirmed. Cross-defendants are to recover their costs on appeal.

Ashby, Acting P. J., and Boren, J., concurred.